United States v. Keith Hagen. Very well. May it please the Court. Mr. Fulton, good morning. You may proceed. Good morning, Your Honor. We're asking the Court to reverse and remand the district court and direct entry of a judgment of acquittal because there was not sufficient evidence from which the jury could find beyond a reasonable doubt or draw reasonable inferences beyond a reasonable doubt that Mr. Hagen, in fact, had the intent to defraud under a series of pasturing agreements. And we see that, Your Honor, when we look at the specific agreements and why performance of the contracts was ultimately not taken full. There was unilateral abrogation of a couple contracts by the opposing party. One contract was frustrated by an act of God, the 2012 drought in northeast South Dakota. Some of the acts are alleged to be fraudulent or acts seeking to achieve compliance and good faith, and two of them involve conduct that's post hoc, after any purported fraud was fully complete and had no impact on bringing the fraud to fruition. Let me get your view on an issue I didn't see covered in the briefs. Your accounts cover three different grazing seasons. Correct. 12, 2012, 13, 14. Correct. What do we do if there was insufficient evidence with respect to the counts of one of the three years? I think the court can reverse and remand on any individual count, Your Honor, obviously. Not Moot, because we have the $100 special assessment. The sentence was 46 months concurrent on all counts. But I think each individual count has to be assessed independently, right? We have the three counts of wire fraud and the three counts of mail fraud,  and conduct that wasn't included in the individual wire and mail fraud accounts. So I think you would look at them individually. And I'd like to turn to looking at these individually, Your Honor, with the recognition. Well, then does a resentencing, in your view, is it required if any one of the eight counts was insufficient? We haven't challenged the sentence, Your Honor, so I mean, we have. I mean, this goes to remedy. I think, Your Honor, given Judge Corman's description of the sentence and the motivation behind it, and going 46 concurrent on all of them, and he did, in fact, consider the 3553A factors, I think at that point the remedy would be entry of a judgment of acquittal on that, you know, and remission of the $100 special assessment. I mean, he's made a determination that he's going 46 months on each individual count, so we wouldn't be asking for resentencing in total. I sense from your opening argument that you're portraying Mr. Hagan as a victim of circumstances. There were some victims here, but I don't know whether it was him. Tell me, we're both farm boys, but you're a rancher more than a farm boy. Where was this land located? It's irrelevant, but I want to know. Where is the land located from the city of Sisseton?  I'm sorry, that would be right on my stomping grounds up in the Glacial Lakes there, but it's west of Sisseton. Is it hilly land? It's obviously not farmable land. Sure. I mean, it'd be typical of that land up there by Sisseton, you know, in that area, it's rolling hills and glacial lakes, potholed country, and you see that with some of the leases where there's talk about usable and non-usable acres, you've got cattail sloughs and some of that in there, but it's generally up in that area, and I haven't laid eyes on this land specifically, but it's rolling grass country for the most part. I've been in Sisseton once in my life. It's a scenic place. It looks out over to the east to the Whetstone Valley where the country is good. But anyway, how do you explain a way that your client leased the same pasture to several different people? Sure. I mean, I think, again, this goes to the fact you have to look at the counts individually, right? And let's start with John Hafner, right? In the 2012 grazing season, Hafner enters a contract for Mr. Hagen to run his cattle. He's going to manage the cattle. He's going to provide forage. He's going to worm them. What does he do for this? I rent a little land. I think I'll have to raise my rent. What did he get for this money? Or what did the victims, I'll call them, the people who brought the cattle, what were they supposed to get for their money? I would refer lessees to victims, yeah. What they get for their money is they get forage, right? They get running of the cattle. They get management of the cattle. He provides in his contracts that he's going to provide a daily check of the cattle. He's going to put mineral out. He's going to track the water. He's going to worm. He's going to provide vaccinations in the summer if they're necessary. He's going to pull the bulls for those cattle that are breeding stock. So he's getting management of the cattle for this five-month period from May to end of September when they're out there. And most of these folks, Your Honor, were from remote areas in South Dakota. We've got folks from De Smet, Mount City, other places where they just can't see their cattle. So he's providing management of the herd, not just the grass. And in any of these years, did he perform any of those duties? Absolutely, Your Honor. So if you look at 2012 in particular, the people who leased that year were John Hafner, Bruce Penner, and the Strohschein family, Andrew and Dale. The Strohscheins are not charged as an individual account. They're part of the conspiracy. But they say in 2012 that they ran their cattle without incident. They put them out there. They came back. Cattle came back fine, a little bit thin because 2012 is a drought year. And so they weren't kind of in the condition they're hoping for. But they clearly said they ran in 2011 and 2012 without incident. Mr. Hagen got their cattle back. They were in fine condition. The drought hurt them. Bruce Penner, same answer. He ran his cattle 2012, said no problems other than we had to pull early because of the drought. And he acknowledges that. If you look at page 162 and 163 of the trial transcript, he says, hey, it was a drought year. We had to pull these cattle. Everyone had trouble with their leases. So to me, that's one where you look at that count three. And the claim is that the act of fraud is the negotiating of the check, which is paid up front for the lease from Penner. Well, that takes place in May. The circumstances on the ground change over the course of that contract. And Penner's got to pull his cattle. There's no involvement of Mr. Hagen on that. John Hafner, same basic allegation. He's charged with wire fraud, the negotiation of the rent check, or the management check, in May. He takes his cattle up there, or more accurately, his hired man takes his cattle up there to drop them off. The hired man is approached by some local concerned citizen who says, hey, if I were you, buddy, I wouldn't put my cattle out there because you're not going to get them back. Dutiful hired man calls the boss and says, I don't know what to tell you, but they're telling us we're not going to get our cattle back. Hafner describes, I had to make a decision the moment I pulled my cattle. The next thing that happens is Hagen calls the Marshall County Sheriff and says, hey, we got stolen cattle. They're supposed to be 66 head out in this pasture, and they're not there. Marshall County Sheriff calls Mr. Hafner, and he says, I pulled them. So I mean, when you look at these two counts, with Penner, we've got an act of God that disrupts performance of a contract. With Mr. Hafner, we've got unilateral abrogation of the contract up front by the lessee. And so, Did he get his money back? Neither of them got their money back, Your Honor. Right. And so, was there any litigation about who should get the money? And, you know, I mean, obviously, you have a contract. There's a potential breach. You know, you pull the cattle without cause. And at that point, you know, the question lies, can someone cover, and what are the damages? But none of that happened, right? That's right. But that, I mean, that's a breach of contract, sir, Your Honor. And the key for us is, Yeah, but if you do nothing and just hold onto the money, right? I mean, don't you have some duty to do something? You might have a contract duty, Your Honor. But to remember, right, the act of fraud that's charged in the indictment is the negotiation of the check. And so, for Mr. Penner, who ran his cattle for the better part of five months, at the time he negotiated the check, the time Mr. Hagen negotiated the check, he was doing everything that was asked for him and continued to do that. God intervened and said, we're not going to get five months out of this grazing season. With Mr. Hafner, he decides, I'm not going to run my cattle. And in fact, Hagen brings up to him, well, you're in breach of contract. You said you're going to run these cattle here. So I'm not going to sit here and tell you that I want to defend that breach of contract suit for Mr. Hagen. But I will tell you, I'll stand here all day and defend the wire fraud. Because at the time he cashes that check, he's got every intention and ability to perform. He had grass leased from the BIA. He had 300 acres that year. And in fact, we know he can do that, because the Stroscheins ran cattle that year. And they had those. And all again, we're talking about 2012. 2012, all in 2012. So if I can pivot then, Your Honor, to the back end. If you look at counts 6 and 7, they're 2013 years. You've got the Kriz and the Stluka families that are running cattle. And we've sort of got the opposite problem in that instance. They contract with Mr. Hagen to run cattle. And they decide, we're not going to take your cattle. And it's at that point that, if there is a fraud, it's complete, right? Because Hagen has represented, I can run these cattle. And they think he can't. But the act of fraud that's charged are letters sent in August saying, hey, bring your cattle. Run your cattle up here. And that conduct is post-fraud. It has no impact on the fraud. And if you look at what we have to have to demonstrate intent to defraud, there must be an act that precedes the fruition of the fraud. That's the Nance case we set in a brief at 502 F-2nd, 615. Or it's got to be an act that's intended to try and put someone off the descent and delay reporting or discovery. We know from Kriz and Stluka that these letters had no impact on their decision. Mr. Kriz says at page 242, line 6, I was nervous about this deal. And I chose not to bring my cattle. When they asked about these letters that were sent to them in August with only a few weeks remaining in the grazing season, he laughed and said, well, that had no impact on me. The grazing season's over. You can promise me all the acres you got. I've got no value in that contract at that point. So that's kind of the opposite, Your Honor, that we have conduct alleged to be fraud that's just after any alleged fraud would have taken place and has no impact on facilitating the purported fraud. The one thing I would tell you that then fits in the middle, Your Honor, is 2014. And in 2014, that is, in fact, the year that Mr. Hagen had the fewest acres available. But what's critical in that instance is how they didn't have acres. He and his wife, Amanda Holyville, had negotiated leases with her family members. And they'd had them for several years. In 2014, they thought, because they had a signature of a majority of the landowner block to lease that land, that they would, in fact, have that land to run again. The BIA had different ideas and took that land out for a bid. The Hafners participated in the bid process, didn't think they'd get it, and immediately appealed. So our position on 2014, Your Honor. Now, were they were outbid as the? They weren't the successful bidders, Judge Locan, yeah. So what was the appeal based on? You shouldn't have put it out for bid? Basically, yes. That they had a negotiated lease with the majority block of landowners. You can either have a negotiated lease that you do in advance with the landowners, or it can go out to bid for the landowners to get highest dollar. They had the required 51% of landowners going into the bid process, and it went out to bid. So their appeal exactly was based on the fact that that land shouldn't have, in fact, gone out to bid. And because they were trying to get the land through appeal, we think they're acting in good faith. Sorry, Judge. Could I take a minute, and with the permission of Judge Wohlman, not take it off your clock. Because of the students out here, could you explain how it comes to pass that there are landowners and the BIA is leasing the land? I would note that you said not off my clock at two minutes and 40 seconds, Your Honor. Yeah, I did mean that, too. We will extend your time, and we will for the government if it's necessary. Absolutely, Your Honor. How there come to be landowners involved? Yeah, how there are landowners, and yet the BIA is leasing the land. Sure, so you have land that's held in trust for individual Indians, Your Honor, by the BIA. And in many instances, as that land is passed down through generations, it becomes fractionalized. It started out, I owned 100% of that land. Then my three sons owned 33%. Theirs owned a smaller and smaller and smaller percentage. So what happens in these instances is that the BIA essentially acts as a broker. They will facilitate aggregation of those leases for approval through these negotiated leases. Or the landowners can simply say, hey, you handle it all. Take it out to bid. Place it with somebody, and we'll just get our check. So that's how that happens. And it was unique here that we had mostly negotiated leases because the vast majority of the land we're talking about with Ms. Holybull were her family members. So she's going out to Auntie and Sister and those folks and aggregating and getting 51% to sign off on their negotiated lease. So that's how that happens. Yeah, I just thought it would likely be confusing. So thank you for the explanation. You bet. If there are no further questions on this, I would reserve some time for rebuttal by taking any other questions. Back to, well, the 2014. The defense is I thought I would have the land? I believed I would have the acres? The defense, Your Honor, is that Mr. Hagan was acting in good faith when he negotiated. So the only count on 2014 is based on a check from the Bergs. It's both a wire fraud and a mail fraud count because the check is mailed, the check is eventually negotiated in the wires, but it's the same check. Did he think he was, was he relying, or is it the defense that he was relying on, he'd have the same acreage that he had in 2013? Correct, Your Honor. Or somehow a much larger acreage that would support the 380 cow-calf pairs that he collected for in advance? It said he would have the same acreage, Your Honor, not that he would have more. And I agree that. He didn't have enough acreage in 2013 to graze as much as he collected for in 14, is my understanding of the government's view of the evidence. Yeah, that is their view of the evidence, Your Honor. I would say that you have to do two things to separate that out, if I may just finish. I'm sorry. One, you are looking with counts four and eight only at those cattle that Mr. Berg was going to run, which is 100 pair, 100 animal units. The conspiracy does incorporate some more cattle, but when you look at counts four and eight, it's only Berg. And this issue of the volume of cattle that could be run was not an issue vis-a-vis the lessor and lessee. It was an issue vis-a-vis the lessor and the BIA, which provided a base animal unit amount that could run. But as they describe, that could be modified. The Hagen Holy Bull Company had extended the number of cattle running without complaint before. And if you look at the contract with the BIA, what's actually provided for is liquidated damages, not that the contract is voided or anything like that. Well, at the moment he accepted that check for the 2014 agreement, what was Mr. Hagen's knowledge about what he would have? What his knowledge was at the time he accepted the check was that land that he had had for approximately 10 years as negotiated leases had been sent out to bid, and he had appealed that because in his belief, under the BIA's own rules, he was entitled to that land. And that's important because he is, in fact, acting in good faith to try and enter these contracts and get the land. But he had no assurance that he was going to win on his appeal. He had no assurance, Your Honor, but remember, we're talking about the intent to defraud, right? So he has to have the specific intent to defraud. Well, intent has to be related to reasonable probability. You're a literary person. Who was the character in Dickens? Mr. McAuguber, who always hoped that something would turn up? I feel like this is more of a Zane Gray case, Your Honor. I don't remember, Your Honor. I prefer Dickens, but that's OK. Thank you for the argument. We will give you time on rebuttal. Thank you, Your Honor. We will hear from the government, Mr. Parsons. Thank you, Your Honor. May it please the Court and my friend, Mr. Fulton. This is an interstate fraud case brought against what I would call a con man who stole at least $236,000 from farmers and cattle producers from Minnesota, South Dakota, and North Dakota, and tried to steal more.  He was able to steal more than $1,000,000. Between 2012 and 2014, Keith Hagen and his partner, Amanda Holybill, placed ads in the Green Sheet, which is the clearinghouse for pasture rights. I read it every week. Yes. You read the Green Sheet? And responded to ads. Because when I got home on Friday night and Mrs. Wallman has brought the Green Sheets from Hy-Vee, I said, maybe we'll go to Culver's for dinner tonight. Interesting. No, no, no. To some, it's considered a tabloid, but what about the negative connotations of a tabloid? Well, I would guess that your opponent reads it faithfully, too. It's an essential document publication for cattle producers. They advertise for rights. Say, I need pasture. They put an ad. If you have pasture to sell or to rent out, you put in an ad. And they do. It has page after page of machinery, vintage cars, hunting, someplace where you can buy parts for a John Deere number five mower that went out of production in 1957. It's a wonderful publication. And this is where you go if you need pasture. Is it? The next time I get one this weekend, I'm going to ask to see if they put any disclaimer in about we're not vouching for the people who are advertising? I hope they're not. But we didn't indict them in this case. But basically, they were advertising land and calling up people who were needing land, affirmatively calling them, and offering them pasture land that they did not have and knew that they did not have. And that's what the evidence showed. They demanded the money up front, usually $35,000 or $17,500 or $46,000. And then they were at the bank the next day trying to get cash for that check. They couldn't get cash. They wanted money orders. And then the typical scenario was when the time for grazing would come in May, May 15, they would try to put off the people for a while. It's not quite ready yet. We're not ready for you. And most of the time, they were never allowed to have their cows grazed. Most of the victims in this case, they would stop answering calls. Contact would cease. The people would have to sell their herd because they had nowhere else to put it. And they took incredible losses far beyond the money that was stolen from them up front. But if that's the essence of the case, why do we have eight counts? Well, there's one global count that covers about 13 victims. Which one is that? Count one, the conspiracy count. From 2012 to 2014, the remaining seven counts are wire fraud and mail fraud counts that are specific. And we elected to specifically charge those counts because they were egregious as well. But count one in and of itself covers the entire conspiracy. Talking about this land, the BIA's role, one of the reasons the BIA is involved is because there's a history in this country of non-Native American cattlemen, ranchers, trespassing with their cattle on Native American lands and destroying those lands. And so the BIA has set up a very strict system to try to prevent that abuse and make sure it doesn't happen. And part of the regime enforced by the BIA is a ratio of cattle, cow-calf pairs to acres of pasture land for a grazing season that you can have a maximum. And that is one cow-calf pair per six acres. And if you go to Exhibit 32, or 52 in this case, prepared by the FBI, in 2012- But what's the significance of that in terms of a lessor dealing with a lessee? So the government can claim wire fraud any time that the lessor, an optimistic lessor, says, for this particular land, I can graze more than those? It's not optimistic. It's fraud when you know that the BIA does not permit you to do that. It's a- Okay, now I need some regulatory citations to support that. That's a dramatic assertion. Yeah, well, the testimony comes from the- Okay, I don't need testimony. You're saying as a matter of law, it's fraud to go outside to be more optimistic than some BIA criteria. That needs case law statute and or regulatory for me. Yeah, well, the- If that's your case, I didn't understand how weak it may be. The entire BIA regime, and the regulations are 25 CFR 166, in particular talks about grazing rights. And they empower the BIA to set these ratios based on range management science. And that's what the ratio is set on. And the testimony of the BIA compliance officer is that they've set that at one cow-calf pair per six acres. And they don't allow more than that. And as testimony of Gerald Thompson- Now, give me the case citation or secondary authority that says a violation of that grazing regulation or rule is fraud. Well, it's fraud to deceive somebody and attempt to take their money deceiving them. Are you saying that the interaction between Hagan and his clients always- He was always a- was in the context of that ratio? Yes. Yes. You've got testimony each of the, what you consider victims, was relying on Hagan complying with the one and six ratio? No. The testimony is that they were relying that they would be able to have their cattle there and that he had the leases sufficient to house, whether it's 200 cow-calf pairs or 100, that they could do that. And he had the authority to do that and the land available to do that. And he didn't. It was a lie. I'm going to have to read the testimony, then, that Mr. Bird, for example, cared about how many, you know, run my 100 head. I'm sure he was assuming that his lessor was going to be in compliance with agency regulations. But I'll bet he didn't enter into the contract in reliance upon the one and six ratio. No, in reliance upon the fact he would be able to graze his cows there for the season. And he wasn't allowed to. You had said at the outset this is fraud because he violated the one and six ratio. And I- At the end of the day, isn't it, you know, I want enough grass and water and manpower to leave my cattle with you and they're going to come back fat and sleek. That's right. That's where we start. And at some point, the BIA has set up this one to six ratio. Does the BIA, you know, have authority to say too many cattle on this particular pasture, it's going to be overgrazed, you're going to do permanent damage to the land, get these cows out of there? Absolutely they did. And Gerald Thompson, the compliant, they were trying to chase these cows off the land. They were sending letter after letter after letter. They were inspecting the land and it was powder in some cases, he testified. Yeah, and so the fraud does not consist in the fact that there may be more cow-calf pairs out there than what the magic one to six acre ratio is. The magic is that at some point somebody's looking at this pasture says it's being overgrazed. And as stewards for the people that are offering the land for lease, that we have some obligation to protect that so that it can be maintained in the future, right? And at some point when there's seven times the number of cattle on that pasture than ought to be there, that's a problem, right? And is that where the fraud lies? Absolutely. And when Mr. Fulton says that can't possibly be where the fraud lies because the fraud lies at the moment that the contract's entered into, why is he wrong? He's wrong because in the cases he cited, the Nance case and I think it was the Tackett case, they say that lulling someone into feeling secure that a crime has not been committed, that there has been no fraud, an attempt to do that is certainly actionable mail and wire fraud. And here, these letters, these are the last two counts involving mail fraud in 2014. These letters were sent towards the end of the grazing season. The cows were never brought up there. They'd been sold already. But they were saying, hey, just so you know, we're sorry for all these problems. We would love for you to bring these cows up right now. That was an attempt to prevent the FBI from getting involved and to try to keep this in the civil arena, I would suggest. And the Tackett case makes clear the sentence right before, I think on page 1244, right before the sentence quoted in the appellant's brief, says that very thing. So that's part of the fraud if you're trying to protect the Ponzi scheme from falling apart. And this was a cattle grazing rights Ponzi scheme. Everyone is promised, I mean, they're promising multiple, multiple number of herds of cattle or number of cow-calf pairs of cattle that could ever be allowed on this land. And the BIA was chasing them off this land. The BIA was saying, you can't come. The BIA was sending letters. These lease are canceled. You're trespassing. This is a trespass. They wouldn't respond to the BIA. And the most important testimony in this case, of course, it So whom, to whom were those letters sent? They were sent to the Holy Bull Cattle Company, Keith Hagen and Matt Holy Bull. That, so was the lack of, is this an overgrazing case or a lack of grazing case? Did he ever have enough land to fulfill the promise he had made to the people who had already given him the money? Never had enough. His best year was 2012. They had enough land where they could graze about 60 cow-calf pairs. They contracted for 180 cow-calf pairs plus 200 heifers. And that's the year, then, Gerald Thompson's going saying, this is powder. 2013 and 14, none of the victims are allowed to even let their cattle get up there. 2013, they had enough land for about 70, and they contracted for 380 cow-calf pairs. And then in 2014, they only had 40 acres. They had enough land for seven about, and they contracted for 300. And here's the worst part about 2014. After they knew they'd lost the bid, the bid meeting has happened, the bids are open, they knew they'd lost. What did Keith Hagen do? He went out and signed up about 200 more head of cow-calf pairs knowing that, taking their checks. And as soon as he got the check, they cash it the next day at the bank. And what happens? They stop, they don't answer calls after that. They never, these farmers are left out to dry. They start calling, can I put them up there? Can I put them up there? They don't even get the courtesy of a response in most cases. Text messages over and over. Call me, please, call me. I need to know what's going on. My dad is worried. These cows need help. No response. Deceit, maybe, lies, but what about Mr. Fulton's argument that the fraud is over, it was committed? After that, all of this was, may have aggravated, certainly angered their, the victims, as we'll call them. Let's see, he's more and more, but is it fraud? It's fraud, that's two counts that they say it's after the fact because it was, they're trying to cover it. But the worst thing, and the thing that seals this, is the testimony of Amanda Holybull, the co-conspirator. She admits, testifies on the stand, I knew it was wrong. We didn't have any land, but yet we still took the money to be able to provide for our family. How do you know Keith knew that? Because like I said, he was the one who would tell me what to say when I go to the BIA. He knew all the mail that came from the BIA. He was with me when we went to the BIA. You were still aware, you and Keith were entering into contracts with producers, knowing you couldn't fulfill them, yes. Knowing you were defrauding producers, yes. And you did it so you could support your family, yes. And you and Keith were in this together, yes, on and on and on. This was easy money, yes. This was a scheme. It didn't start as a scheme. This started as a legitimate company with a little, a small amount of acres in like 2005. Now, there was a restitution awarded of $236,000. Yes. I assume that the victims for that purpose are these producers. That's right, about 12 producers. If we were to reverse all of the seven specific counts and affirm on the conspiracy count, in your view, would that potentially affect the restitution award? No, I don't think it would. I think it was awarded on each count. Would we need to remand for the district court to consider that? No, I think you could just remand as you did in United States v. Grimes. Oh, I know, but just drop the $100. I'm familiar with those cases. Yes. This would be more substantive. Why wouldn't the district court's review of that be required, in your view? Because I think the $236,000 was entered as restitution on count one individually and on each count. And so, but none of these counts should be remanded. Each count was an act of fraud as admitted by the co-conspirator on the stand. Now, the jury didn't have to believe her, but it did. This court doesn't reweigh the testimony. Mr. Hagan never testified. What we have from Mr. Hagan about these stories about drought and things like that come from, well, those are the, that's what he was telling these producers when they're saying, you have to take these cows off my land because of the drought. That's what he told them. The reality, I would suggest, a reasonable inference, and if you look at the BIA compliance officer's testimony is, they had to get those cows out of there because the BIA told them they had to. Respectfully, Your Honor, we ask that this court affirm each count of this conviction. The question, maybe I should have asked Mr. Fulton, the reply refers to several issues which the defendant says your office didn't reply to. Is that the case? And if so, why not? I don't think so. I think those are all part of the factual story that's being put forth by the appellant. Not from himself, but through him trying to piece together the testimony at trial. Each, everything has an answer. Okay. Very well. Thank you. Mr. Fulton? Briefly, Your Honor, if I may, I would just say this. In reviewing the counts, it is critical that the court look at the individual act alleged because the timing is crucial on several of them. On all of the substantive counts. I agree the conspiracy is overarching, but on the individual counts, you have to look at the act alleged and did it, could it have impact on the fraud? And, you know, particularly with counts six and seven on the letters, they're after the others. You have events after where the other contracting party or an act of God intervenes and disrupts the performance. But what is the principal defense? Lack of intent to defraud? Yes, Your Honor. Well, as the case law, as well as we do, for example, Judge Tolkien's opinion in the Walker case, the scheme often serves as evidence of a defendant's intent to defraud. Whereas Judge Bower said it for the Seventh Circuit in the case, events like that can provide a surrogate for your client's knowledge. And if the client's knowledge goes to his intent to defraud, I guess. Correct. I mean, and again, Your Honor, I think that's why, obviously for us, the hardest count to address is, in fact, the overarching conspiracy. Because the full body of work gets considered there. But for the individual counts, again, where you have count two where the other lessing party pulls the cattle, where you have count three where the drought pulls the cattle early, where you have letters that with Mr. Kriz and Mr. Sluka said, we'd already decided we weren't taking cattle. These letters were nothing to us. I think on those individual counts, it's the reasonable inference that the jury couldn't draw ultimately. And we know a little bit how juries work, right? I mean, when you start going guilty, particularly on the overarching conspiracy, chances are they're voting a straight party ticket on that deal. So I think you have to view it through that real lens, too. Well, I understand both arguments. Well presented, well argued, and the case is now submitted, and we will take it under consideration.